Filed 2/27/23  P. v. Dehart CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JEREMY COLE DEHART,<br><br>Defendant and Appellant. | F082159<br><br>(Super. Ct. No. F13903775)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  W. Kent Hamlin and Arlan L. Harrell, Judges.†

Carla J. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

† Judge Hamlin presided over the trial; Judge Harrell presided on December 9, 2020.

Appellant and defendant Jeremy Cole Dehart was convicted at a bench trial of the first degree murder of Peter Millard. The trial court also found that defendant used a deadly weapon, a knife, within the meaning of Penal Code section 12022, subdivision (b)(1) in commission of the murder.[1] The trial court sentenced defendant to 25 years to life for murder plus one year for the weapon enhancement. On appeal, defendant contends reversal is required due to insufficient evidence of premeditation and deliberation, the trial court basing "its decision on an incorrect understanding of the applicable legal standards as to heat of passion," and error from the denial of his motion for new trial. Defendant also contends that he was denied effective assistance of counsel and cumulative error deprived him of his right to a fair trial. Rejecting these claims, we affirm.

## FACTUAL BACKGROUND

*Prosecution Evidence*

In April 2013, defendant was 20 years old and living with his mother, Mary, in Auberry.[2] Defendant and his mother lived in the main house for his entire life, and Rhonda lived in a trailer behind the main house with her boyfriend, Peter Millard. The house was in the process of foreclosure, and junk was accumulating in the yard. Defendant's brother, Aaron, moved out of the family's home approximately six months earlier, but he still saw defendant weekly.

Rhonda lived in the trailer and was reportedly using drugs. Rhonda initially met the family when defendant was 14 years old. Rhonda lived on the property for several years, and she was like another mother to Aaron and defendant. Aaron had a physical

---

[1] All further statutory references are to the Penal Code.

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

altercation with Rhonda's previous boyfriend, Chris, before Aaron moved out of the home.

After Mary's husband passed away, she began to allow multiple people to live in her home in order to pay the mortgage. Millard was a friend of Mary's, and, in the fall of 2011, Mary allowed him to live on the property. Weeks later, Millard moved in with Rhonda in her trailer. Rhonda believed her relationship with Mary began to deteriorate because Mary was jealous of the relationship between Rhonda and Millard at the beginning of 2012. Rhonda's relationship with defendant also began to change, and she claimed he made comments that Millard was not wanted on the property.

Aaron believed defendant—as the new man of the house—had taken on the responsibility of dealing with the problems caused by Millard. Defendant informed Aaron that Millard was walking around with a gun at night with people coming and going from the trailer at all hours of the night. Defendant accused Millard of stealing his clothes, joyriding in his truck, and knocking on his bedroom wall.

Defendant's family had problems with Millard stealing items from them to sell for money or drugs, and Aaron described Millard and his friends as "tweakers." Aaron heard that "things were going on" between defendant and Millard from Mary. Mary observed Millard going through their bedrooms and taking electronics from her home. She also had recently seen him walk around their yard with a loaded gun at 2:00 a.m. There were two verbal altercations between Mary and Millard in February and March 2013 about finances, which Mary believed defendant could have overheard. Millard refused to help Mary financially when they needed to move, and Millard never paid any rent according to Mary.

Rhonda witnessed defendant show aggression toward Millard on multiple occasions, and she believed defendant did not want Millard on the family's property. Rhonda also saw defendant hit walls when he became angry during fights between defendant and Mary about Mary's drinking.

3.

Rhonda called law enforcement on several occasions after defendant yelled threats toward Millard. During separate incidents, Rhonda believed defendant yelled, "you need to leave before it's too late," and, "[y]ou better hope I don't black out you SOB," toward Millard.

Mary had no prior knowledge of defendant blacking out in the past, but she claimed blackouts run on her husband's side of the family.

The previous month, defendant went after Millard with a metal bar and broke down a fence around Rhonda's trailer. Law enforcement responded and recommended that any firearms be removed from the property. Afterward, Mary informed Rhonda and Millard that Millard could not be left alone on the property. Defendant and Millard were each told to stay away from each other as well.

Rhonda decided she would no longer pay rent shortly after this incident, and defendant was aware that Rhonda had not paid rent since the previous year.

Rhonda recalled an incident that occurred two weeks prior to Millard being killed where defendant stopped her at the back door of the main house to say, "I have researched and read books on how to kill somebody and get away with it. He needs to go."

On April 25, 2013, Mary and Michael, Mary's husband, left the family's home to work and run errands around 2:00 p.m. Between 3:30 p.m. and 4:30 p.m., defendant was working in the front yard when his neighbor Joe contacted him. Defendant agreed to feed Joe's dog while Joe and his family were out of town as defendant had done on previous occasions. The conversation lasted a couple minutes, and Joe noticed nothing unusual about defendant either on that day or in the past.

At approximately 8:30 p.m. defendant called Aaron for help. Aaron knew something was wrong because defendant would not reveal the reason that he needed help. Aaron drove to defendant's home with his friend Eric in separate cars. Upon their arrival, Aaron found defendant "in a panic" inside the home. Defendant was pacing back

4.

and forth and holding a pencil to his neck. Aaron convinced defendant to take the pencil off his neck and sit down. He observed blood on both sides of defendant's hands. Aaron proceeded to ask defendant if he killed someone, and defendant responded, "Yeah." Defendant then identified Millard as the person he killed and directed Aaron to the backyard. Eric contacted law enforcement at Aaron's request.

Aaron walked to the backyard and discovered Millard's body under a tarp. He could tell Millard was "gone" because the body did not move after he nudged it with his foot. Defendant told Aaron that he blacked out after becoming involved in an altercation with Millard. Defendant recalled waking up by the washing machine with blood on his hands and Millard's clothes in the washing machine. Aaron did not notice any difference between defendant's demeanor and attitude since he last saw him two days earlier. He described an incident where defendant "freak[ed] out" (boldface omitted) by not finishing a soda that he believed to contain shards of metal a week or two earlier. Aaron did not believe defendant ever had any prior mental health treatment or blackouts. He denied having any knowledge that defendant used drugs, and he acknowledged that defendant would be angry if defendant was offered drugs by Millard.

Mary returned to the family's home before law enforcement arrived, and Aaron told her that she could not go in the home. She went into the house and saw defendant sitting at the kitchen table. Mary asked defendant what had happened, and she described his response as follows:

> "He started mumbling. First he told me, um, He was talking shit on Rhonda. I said, Who was talking shit on her? [Millard]? Okay. Then he said something else, and I don't remember. It's been so long. And then the last thing he told me was that, Then he offered me dope, and I blacked out. I said, What you do mean he blacked out? He goes, I blacked out, mom. I don't remember nothing until later. And I was standing by the green tank. I go, What happened? He says, I killed him."

As defendant finished speaking to Mary, officers with the Fresno County Sheriff's Office arrived on the scene. Defendant was detained in a deputy's patrol vehicle when the crime scene detective, J. Stricker, arrived at approximately 10:30 p.m. Stricker explained the upcoming process to defendant, and defendant only requested that Stricker "tell Rhonda I'm sorry." A homicide detective, M. Chapman, responded to the scene to investigate a deceased person and suspect thought to be responsible for the death. Shortly after midnight, Chapman began conducting interviews with Joe, Mary, Michael, Aaron, Eric, and Rhonda.

The next morning Chapman and Detective D. Chatman interviewed defendant at the jail. Defendant was cooperative and appeared calm to Chapman. Defendant was able to sleep "a little bit," but he did not sleep well. Defendant provided a height of five feet five inches and a weight of 135 pounds. The detectives read defendant his *Miranda*[3] rights and recorded the interview.

Defendant described how he began the previous day pressure washing for his neighbor. The neighbor drove him back home at approximately 3:00 p.m. He changed from his wet clothes into military-style pants and tank top. Mary and Michael left for Fresno approximately two hours after defendant returned home. He ate food and watched television.

At approximately 4:30 p.m., defendant started walking around the property, and he drew Millard out of the trailer by shooting BB's at the window with his slingshot. He shot at the trailer to "piss [Millard] off," and Millard "flipped [defendant] off" in response. Defendant contacted Millard at the gate to Rhonda's trailer. He and Millard began walking around and "talking about everything underneath the sun." Millard began to tell him that Rhonda lies, steals, and cheats. According to defendant, Millard pulled

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

out a little vial that looked like "little cork rocks" and offered him some drugs. He detailed his interaction with Millard more specifically as follows:

> "I know that I did wrong. I snapped and I, I blame the fact that I had built up anger and pent-up anger, 'cause I'm not the kind of person to crack. And that's what's- really hard for me sometimes is just to . . . to let it out. But, um . . . the only things that I really remember was me and him talking. He started badmouthing Rhonda . . . . And I look at her . . . like another mother. So, it- it hurt me in a really strong way you know? And I, I mean, I've blown up on her once or twice, but I've ever done anything. Um, and then he . . . then he offered me you know a little, a little thing of drugs that he had in his pocket. And it's not like he pulled it out all the way, but it just kinda a glance and then flash red and yellow and then I'm over there by the green tank. And . . . that's- and when I realized what I was doing, I flipped out. I flipped out so badly that you know . . . I, I knew what I did was wrong, I didn't know how to act." (Some capitalization omitted.)

Defendant recalled walking with Millard near a green tank in the backyard when he saw "red and yellow." He believed Millard hit him in the face, and the last thing he could remember was being on top of Millard with a knife. Millard hit defendant once or twice on his left cheek bone when he was sitting on Millard's stomach. He cut Millard's throat with a pocketknife. He demonstrated to the detectives how he slit Millard's throat from left to right using a pen on his hand. At the time, he thought he was punching Millard in the face, but he realized he had a knife in his hand. He believed he punched Millard more than 10 times in the face, and he did not remember pulling the knife out of his pocket. The knife was a pocketknife with a four and a half-inch blade that he carried around every day. He realized the physical altercation was over when the knife was at the front part of Millard's throat.

Defendant dragged Millard's body toward the greenhouse and covered him up with a tarp. While he was panicking, he took off Millard's shoes to hide Millard's footprints. After shaking and crying on the ground, defendant recalled crawling back to the house on his belly, throwing his clothes in the washer, and taking a quick shower. He had scratches on his chest that were either from Millard or scrubbing during the shower.

7.

He threw chili powder around the house because he thought it would stop a dog's scent. He placed Millard's cell phone and cap in a box by the bathroom. Joe spoke with him about watching Joe's dogs while he was cleaning up the house and making a burn pile. He tried to put Millard's body in a wheelbarrow, but it was too difficult. He decided he would be better off shoving a pencil in his neck, and he called his brother out of "pure panic."

He claimed he blacked out, and that he previously blacked out on two or three prior occasions. One prior blackout reportedly occurred when he went "overboard" by punching the back door of the house for 10 minutes, and the other time occurred when he smashed Rhonda's gate with a metal bar the previous month. He had never seen a physician regarding the blackouts, but they only occurred when a subject "build[s]" until it causes him to snap.

He had been upset with Millard because he stole items from their home, but he believed he became really upset after Millard offered him drugs. He wanted to get into a fistfight with Millard, and he acknowledged that his "pent up" anger gets the best of him. He told detectives that "there's no justification for what [actually] happened," but he explained how he quit smoking marijuana two months earlier. He used to smoke marijuana to control his temper.

Defendant suffered a bump on his forehead from slamming his head in the squad car. The only other injuries noticed by detectives during defendant's initial interview were abrasions to his chest and elbows.

A search of defendant's home was conducted pursuant to a warrant at approximately 8:00 a.m. on April 26, 2013. Officers found defendant's clothes and pocketknife in the washing machine. There were no narcotics found during a search of the property.

Dr. Michael Chambliss, a forensic pathologist, performed an autopsy on Millard. Millard was 5 feet 10 inches in height and weighed 150 pounds. Millard had more than

8.

30 stab wounds on his body and four cut wounds to the neck. Millard's left hand had a deep cut that was consistent with a defensive wound. Multiple stab wounds entered both of Millard's lungs. Chambliss also noted stab wounds to the back of Millard's head and neck. There were four horizontal wounds across the front of Millard's neck, which became progressively deeper from left to right. The cause of Millard's death was the transection of the right common carotid artery in the neck, right and left internal jugular veins in the neck, the larynx in the neck, and stab wounds to the chest that injured the lung. A blood screen revealed a positive result for a high level of methamphetamine in Millard's blood.

## PROCEDURAL BACKGROUND

On April 29, 2013, a complaint was filed in the Superior Court of Fresno County charging defendant with one count of murder (§ 187, subd. (a)), with the special allegation that defendant used a deadly and dangerous weapon, a knife (§ 12022, subd. (b)(1)). A doubt arose as to defendant's mental competence after his arraignment in May 2013, and the criminal proceedings were suspended for defendant to undergo a psychiatric examination.

On June 5, 2013, Dr. Luis Velosa found defendant competent to stand trial with no evidence of psychotic symptoms, psychiatric disorders, schizophrenic behaviors, or developmental disabilities. The proceedings were reinstated on June 27, 2013. Defendant was arraigned on an information containing the same allegations as the initial complaint in February 2014.

Another examination of defendant's mental competence was ordered on September 10, 2015. On September 24, 2015, Velosa found that defendant suffered from a psychotic disorder, possible schizoaffective disorder, paranoid delusions, and auditory hallucinations. The criminal proceedings were suspended by the trial court on October 15, 2015. It was also recommended that defendant be held in a locked

9.

psychiatric unit. On November 19, 2015, defendant was ordered to be committed to a state hospital with authorization for antipsychotic medication administration.

A February 9, 2016 progress report by forensic psychologist, Dr. Ana Kodžić, indicated defendant's treatment team believed he was closely approaching competency. In May 2016, Kodžić recommended that defendant be returned to court as competent to stand trial. The rationale for defendant's diagnosis of unspecified schizophrenia and other spectrum disorder was attributed to defendant's history of inconsistent symptom presentation. Defendant was described as an inconsistent mental health historian with a large degree of "secondary gain" from appearing mentally ill. It was noted that defendant only verbalized beliefs that he was being spied on by the government when interacting with clinicians and when it might be to his benefit. Defendant appeared "savvy enough" to claim that medications were improving his symptoms. Kodžić concluded the report by explaining:

> "Therefore, it appears unclear whether [defendant] does, in fact, suffer from a mental disorder. What is evident, is that there is virtually no secondary gain in [defendant] becoming competent to stand trial and yet there is all the secondary gain in remaining incompetent to stand trial, and [defendant] has been suspected of malingering during each of the steps of the evaluation at the hospital, by almost every clinician that evaluated him."

The medical director of Atascadero State Hospital certified that defendant was mentally competent to stand trial on June 2, 2016. On June 22, 2016, defendant was found competent to stand trial and criminal proceedings were reinstated. However, after additional continuances, criminal proceedings were suspended for an additional evaluation on June 22, 2017.

On July 18, 2017, Dr. Howard Terrell, recommended that defendant be found mentally incompetent to stand trial. Terrell reported that defendant presented as paranoid and psychotic. Defendant described auditory hallucinations that tried to manipulate and

10.

confuse him. On August 25, 2017, defendant was committed to the State Department of State Hospitals with authorization for antipsychotic medication administration.

In May 2018, Kodžić found defendant was not yet competent to stand trial. Defendant was diagnosed with schizophrenia, malingering (provisional), antisocial personality disorder, cannabis use disorder, and alcohol use disorder. It was noted that defendant appeared to be over-reporting auditory hallucinations, and his reports were also vague and inconsistent. A provisional diagnosis of malingering was given because it appeared defendant was fabricating or exaggerating his psychiatric symptoms to extend his stay at the state hospital. Defendant indicated he would stop his medication if returned to the county jail because he preferred the state hospital over the county jail. Although defendant may have been competent to stand trial, Kodžić did not have sufficient data to show that he understood the charges against him.

In July 2018, a progress report by Kodžić recommended that defendant be found competent and transferred to an alternative hospital setting for the continued administration of psychotropic medication. Based upon the observations of staff and psychological testing, Kodžić believed defendant was malingering psychiatric symptoms and memory difficulties. On August 23, 2018, defendant was found competent to stand trial, and multiple settlement conferences were held over the next several months.

On January 23, 2020, defendant waived his right to a jury trial, and the case was assigned to Judge W. Kent Hamlin. The parties stipulated that the trial court could consider various mental health evaluations of defendant during its evaluation of defendant's intent.

On February 24, 2020, defendant was found guilty of first degree murder and the deadly weapon enhancement was found true after the bench trial. On June 11, 2020, the trial court granted defendant's motion for his private counsel to be relieved, and new counsel was appointed to represent defendant.

11.

Defendant filed a motion for new trial on November 23, 2020.  Judge Arlan L. Harrell denied defendant's motion for new trial on December 9, 2020.  Thereafter, defendant was sentenced to 25 years to life in state prison for murder with an additional year for the weapon enhancement.

## DISCUSSION

### I.  Premeditation and Deliberation

Defendant contends there was insufficient evidence of deliberate and premeditated murder, and his conviction for first degree murder must be reversed.  Defendant argues that the trial court improperly ignored evidence of defendant's mental illness and experience of blackouts.  He also argues that his actions leading up to and after the killing were insufficient to establish a preconceived plan and deliberate murder.

#### A.  Applicable Law

"First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation, which trigger a heightened penalty." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.)  "That mental state is uniquely subjective and personal.  It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*Ibid.*)

The issue on appeal concerns the trial court's finding of premeditation and deliberation.  " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' " (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)  Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*Ibid.*)  Deliberation " ' "refers to careful weighing of considerations in forming a course of action . . . ." ' " (*Ibid.*)

In *People v. Anderson* (1968) 70 Cal.2d 15, the California Supreme Court surveyed prior cases and developed guidelines to aid reviewing courts in assessing the sufficiency of the evidence to sustain findings of premeditation and deliberation. (*Id.* at pp. 26–34; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1182–1183.) The court identified three categories of evidence pertinent to this analysis: planning, motive, and manner of killing. (*People v. Bolin* (1998) 18 Cal.4th 297, 331-332 (*Bolin*), citing *Anderson*, *supra*, at pp. 26–27.) Notably, the *Anderson* guidelines are " 'descriptive, not normative,' and reflect the court's attempt 'to do no more than catalog common factors that had occurred in prior cases.' " (*Young*, *supra*, at p. 1183.) *Anderson* does not require these factors be present in some special combination or that they be accorded a particular weight, nor is the list exhaustive. (*Bolin*, *supra*, at p. 331.) *Anderson* was intended to guide an appellate court's assessment whether the evidence supports an inference the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. (*Bolin*, at pp. 331–332; *People v. Pride* (1992) 3 Cal.4th 195, 247.)

### B. Standard of Review

On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Bolin*, *supra*, 18 Cal.4th at p. 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

"The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.) It is

the trier of fact, not the appellate court, which must be convinced of a defendant's guilt beyond a reasonable doubt. (*Ibid*.) If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. (*Ibid*.)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis . . . is there sufficient substantial evidence to support" ' the [trial court's] verdict." (*Ibid*.)

### C. Analysis

Defendant argues that there is insufficient evidence that he acted with premeditation and deliberation under any of the *Anderson* factors—motive, planning activity, and manner of killing. We disagree. There was evidence of motive, planning, and manner of killing from which the trial court could conclude that defendant acted with both premeditation and deliberation.

As for motive, there was strong evidence in the present case of defendant's escalating animosity toward Millard in the months preceding the killing. Defendant acknowledged that he was upset with Millard for stealing items from his house, and he was well aware that Millard stopped paying rent to live on their property. The prior verbal altercations between Millard and defendant provided evidence of a prior relationship and conduct from which the trial court could have inferred a motive to kill Millard. (See *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up resentment toward his victim[] establishes the prior relationship from which the jury reasonably could infer a motive for the killing[]."].)

Concerning planning, defendant made a conscious decision to "instigat[e]" an encounter with Millard while no one else was on the property. The pocketknife that

14.

defendant used to kill Millard was still in defendant's possession after he changed his wet clothes from work. The most significant aspect of defendant's plan to kill Millard is the fact that he armed himself prior to the altercation. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 (*Steele*) ["[The] defendant carried the fatal knife into the victim's home in his pocket, which makes it 'reasonable to infer that he considered the possibility of homicide from the outset.' "].) Defendant had been advised to stay away from Millard by his mother after law enforcement previously responded to the home, and the trial court could reasonably question his purpose in arming himself before an anticipated altercation.

Furthermore, the trial court found Rhonda's statement that defendant had researched how to kill someone and get away with it had credibility. Defendant's contention that his "hastily executed" action with "no thought as to what to do after the killing" was insufficient to establish premeditation is without merit. This argument ignores that premeditation and deliberation do not always require "strong evidence of planning" (*People v. Williams* (2018) 23 Cal.App.5th 396, 411), that the evidence supports a finding of some planning, and that defendant was a poor planner does not mean he was not planning at all.

The manner of killing also suggested premeditation contrary to defendant's suggestion that he committed a "rash spontaneous act." A violent and bloody death sustained as a result of multiple stab wounds can be consistent with a finding of premeditation. (See, e.g., *People v. Perez* (1992) 2 Cal.4th 1117, 1125.) Defendant stabbed Millard more than 30 times. The wounds were concentrated in Millard's chest and neck, and the forensic pathologist noted stab wounds to the back of Millard's head and neck with likely defensive wounds on Millard's left hand. In contrast, defendant suffered nearly no injuries, which suggests the attack was one-sided and launched from an advantage by defendant. (*People v. Pride*, *supra*, 3 Cal.4th at p. 247 [manner of killing evidenced reflection where the victim was stabbed 18 times with majority of wounds located in victim's torso].)

15.

Defendant's reliance on *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270, in which the Court of Appeal found insufficient evidence of premeditation and deliberation, is misplaced. In *Boatman*, there was no evidence of planning and little to no evidence of motive. (*Id*. at pp. 1267-1268.) As we have explained, evidence of both planning and motive was present here. The trial court could reasonably infer premeditation and deliberation from the number of stab wounds that Millard sustained and from the location of those wounds, particularly the ones that severed his carotid artery. (*People v. Williams*, *supra*, 23 Cal.App.5th at p. 410 ["The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise."].)

Finally, we reject defendant's claim that his ongoing mental disorders and claims of previous blackouts raised a reasonable doubt regarding premeditation and deliberation. These claims are primarily based upon defendant's own self-serving statements without additional evidence to substantiate them. Defendant's mother and brother both denied any knowledge that defendant had prior blackouts or mental health issues. That defendant may have been suffering from mental illness in the years after the killing does not negate the significant evidence that he acted with premeditation and deliberation on the date of Millard's murder.

The trial court could reasonably question defendant's ability to remember everything before and after stabbing Millard. Furthermore, defendant's changing recollection about the moment he returned from his "black out" also diminishes his argument. Defendant claimed he woke up from the blackout while (1) in front of the washing machine when talking to his brother, (2) near the green tank when talking to his mother, and (3) sitting on top of Millard with the knife to his throat when talking to detectives. Defendant's statements were inconsistent with the evidence and the trial court was permitted to reject them in reaching its verdict.

Though defendant argues that some or all these facts are consistent with a contrary finding, when viewed in the light most favorable to the judgment, a reasonable trier of fact could conclude defendant deliberately and with premeditation killed Millard.  That the facts could be reconciled with a contrary finding does not permit us to contradict the trier of fact's judgment.  Consequently, we conclude the trial court's finding of first degree murder was supported by substantial evidence.

## II.  Application of Legal Standard for Heat of Passion Defense

Defendant contends the trial court made comments revealing it applied an incorrect understanding of the legal standards governing heat of passion, which could reduce murder to voluntary manslaughter.  The People claim that defendant forfeited such an argument and any ineffective assistance by defendant's counsel in relation to making such an objection was not prejudicial.  Forfeiture aside, we find defendant's claim of legal error regarding the trial court's comments is without merit.

### A.  Factual Background

During closing argument, defendant's trial counsel urged the trial court to consider second degree murder or voluntary manslaughter.  In doing so he suggested that defendant may have been provoked by Millard's drug use, possession of a firearm, or built-up stress from prior interactions with Millard.  Defendant's counsel then stated,

> "[I]f we look at CALCRIM for voluntary manslaughter, . . . it is interesting that we're to apply to a set of facts in order to determine whether there was adequate provocation of a person of average disposition.  Well, my client wasn't a person of average disposition.  My client had an undiagnosed and unidentified mental health issue who told the officers he blacked out. . . .  So I don't think you can plug in . . . the average disposition of the guy, you have to plug in somebody that has a mental health issue to see if that was provocation to reduce him to manslaughter.  Now, . . . he told the police he did use the knife.  He thought he was punching him, which could account for some wounds he received, and there were an awful lot of wounds inflicted by a pocket knife, which would certainly demonstrate that my client had a lot of rage when he killed Peter Millard, but again, was the rage based

17.

on some provocation in my client's mind or was it just because he didn't like Peter Millard?"

In its rebuttal argument, the prosecutor countered that Millard's being under the influence of methamphetamine was insufficient to establish provocation. The prosecutor highlighted defendant's own statement that his reaction was attributed to Millard making negative comments about Rhonda and offering him drugs. The lack of evidence of a drug container being present on the property and defendant's own acts to provoke Millard were also discussed as reasons adequate provocation was not present.

The trial court discussed defendant's heat of passion claim, as follows:

"Now on the manslaughter defense, let's just face this; there was no way a person of average disposition, even if—first of all, there's no evidence that Peter Millard offered him methamphetamine except his own statements that [Millard] did, and no evidence to corroborate it. Really we don't even have a lot of discussion where [Millard]'s bad mouthing Rhonda except according to the defendant. But even if one accepted that he was out there calling Rhonda whatever, and then tried to give defendant, or sell defendant, some meth, a person of average disposition does not then go off on an enraged assault with a knife ending it in death. That's not a justification, that's not a fit of passion as CALCRIM 570 and case law supports. He is not permitted to set up his own standard of conduct, and a person of average disposition might be pissed, might punch [Millard], maybe take some more aggressive physical action towards him, but he wouldn't, as [the prosecutor] points out, jump him and execute him as he did [Millard]. There's every reason to believe that he just caught [Millard] off guard, that he put himself in a position where he could do that, and when given the opportunity, he did; catch him off guard, stab him repeatedly."

### B. Legal Principles and Standard of Review

"The mens rea element required for murder is a state of mind constituting either express or implied malice. A person who kills without malice does not commit murder. Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an

18.

extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942, fn. omitted (*Beltran*).)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) From an objective standpoint, the provocation must be such as would "render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*Beltran*, *supra*, 56 Cal.4th at p. 957; accord, *Steele*, *supra*, 27 Cal.4th at p. 1252 [The " 'heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances.' "].) In simple terms, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.) To satisfy the subjective component, a defendant must be shown to have acted in the heat of passion because he was in fact provoked. (*Steele*, *supra*, 27 Cal.4th at p. 1252.) Both aspects require proof of instigating behavior by the victim, meaning "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

"As a broad general proposition, cases have stated that a trial court's remarks in a bench trial cannot be used to show that the trial court misapplied the law or erred in its reasoning. [Citations.] These statements are founded on the principle that, in a criminal bench trial, the trial court is not required to provide a statement of decision and that any explanation of his or her decision a trial judge provides is not part of the record on appeal." (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302 (*Tessman*).)

However, "[t]his broad proposition has been subjected to an important limitation. . . . [W]e may nonetheless consider a judge's statement when, taken as a whole, the judge's statement discloses an incorrect rather than a correct concept of the relevant law, 'embodied not merely in "secondary remarks" but in [the judge's] basic ruling.' " (*Tessman*, *supra*, 223 Cal.App.4th at p. 1302, italics omitted.) Under this approach, "[t]he oral opinion of the trial court may be used in interpreting the court's action in its decision of the case if it unambiguously discloses the mental processes of the trial judge in reaching his conclusion." (*People v. Butcher* (1986) 185 Cal.App.3d 929, 936.)

Accordingly, a criminal defendant, may seek reversal on appeal if the trial court's statements in delivering its ruling, "unambiguously disclose that, in his or her ruling, the trial judge applied an erroneous interpretation of the law." (*Tessman*, *supra*, 223 Cal.App.4th at p. 1303, italics omitted; see *In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1440 (*Jerry R.*) ["An exception to this general rule exists when the court's comments unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law."].)

### C. Analysis

The People acknowledge that the trial court did misstate the law by focusing on the specific action taken by defendant when it said, "But even if one accepted that [defendant] was out there calling Rhonda whatever, and then tried to give defendant, or sell defendant, some meth, a person of average disposition does not then go off on an enraged assault with a knife ending it in death." However, the People contend that the trial court's overall ruling was correct. We agree.

The hypothetical used by the trial court during its discussion of the heat of passion defense assumed facts that the trial court ultimately rejected as lacking an evidentiary foundation. The trial court did not believe defendant's statements that Millard offered him drugs or made insulting comments about Rhonda. It ultimately believed that the

evidence established defendant's conscious decision to "jump" and "execute" Millard. Indeed, the present circumstances overwhelmingly demonstrate that defendant initiated an attack on Millard to seek revenge on Millard for his prior thefts from the family's home. Read as a whole, the trial court's ruling appropriately concluded that the evidence did not establish heat of passion as supported by CALCRIM No. 570 and case law.

CALCRIM No. 570 states in relevant part:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] 1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND [¶] 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"[If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.]"

Our Supreme Court has determined that CALCRIM No. 570 properly sets forth the relevant mental state for heat of passion. (See *Beltran*, *supra*, 56 Cal.4th at p. 956.) In *Beltran*, upon which defendant relies, the jury had been instructed with CALCRIM No. 570 on the elements of voluntary manslaughter. During deliberations, the jury sent an inquiry to the trial court that specifically identified its subject as CALCRIM No. 570, the court's instruction on the elements of voluntary manslaughter. The inquiry asked essentially whether it was sufficient that a reasonable person would have acted rashly or whether it must be the case that a reasonable person would have killed. (*Beltran*, at p. 945.) The trial court responded: " 'The provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion that his judgment or reasoning process was obscured. This is an objective test and not a subjective test.' " (*Id*. at p. 945, fn. omitted.)

The defendant argued that the trial court's response was ambiguous, and the Attorney General took the position that the correct standard was whether a person of average disposition would have killed. (*Beltran*, *supra*, 56 Cal.4th at pp. 945, 949.) The California Supreme Court rejected both of these positions. It held that the correct standard was whether a person of average disposition would have acted rashly and that the trial court's response was not ambiguous. (*Id*. at pp. 949, 954.) However, the California Supreme Court noted that the arguments by counsel to the jury "may have confused the jury's understanding of the court's instructions." (*Id*. at p. 955.) Because of that confusion, the trial court's response to the jury's inquiry, which did not directly answer the jury's question, failed to " 'clarify' " the point. (*Ibid*.) Noting that instructions on a lesser included offense are reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836, the California Supreme Court concluded that it was not "reasonably probable that any possible ambiguity engendered by counsel's argument misled the jury." (*Beltran*, at p. 956.)

Here, the trial court determined there was insufficient evidence to establish that Millard even provoked defendant in the first place. Unlike the analysis disapproved of in *Beltran*, the trial court did not refuse to find defendant acted in the heat of passion based upon his actions not conforming with that of a person of average disposition. When viewed in this light, it is apparent that the trial court's actual reason for rejecting defendant's voluntary manslaughter defense was the absence of evidence of provocation. The trial court would have been required to find both the existence of provocation by Millard and that an ordinary person would have acted rashly and without deliberation and reflection in response to such provocation. Since the trial court found provocation was not present, its hypothetical statement regarding defendant's specific response to the provocation alleged by defendant is immaterial to the trial court's ultimate decision.

Accordingly, we conclude the trial court understood the requirements of CALCRIM No. 570 and appropriately determined that provocation had not been established. Therefore, the trial court's hypothetical statement did not "unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law." (*Jerry R.*, *supra*, 29 Cal.App.4th at p. 1440.)

### III.    Denial of Motion for New Trial

Defendant's next contention is that the court abused its discretion when it denied his motion for a new trial. In support of this argument, defendant argues that an incorrect understanding of the heat of passion legal standard was utilized in denying the motion, prosecution witnesses lacked credibility, and his counsel's deficient performance was prejudicial.

#### A.  Factual Background

On November 23, 2020, defendant's newly appointed counsel filed a motion for new trial accompanied by a log of jail visits and defendant's declaration. The motion alleged that the evidence did not meet the standard for a first degree murder verdict, prosecution witnesses lacked credibility and reliability, and defendant's counsel was

23.

ineffective. The motion alleged defendant's counsel was ineffective for failing to present mental health evidence, visiting defendant in jail only one time in November 2014, and calling no witnesses on defendant's behalf. In his declaration supporting the motion, defendant alleged he wanted to provide information about his sister and employer as he believed they "could have helped." The prosecution opposed the motion and discussed the various witnesses that testified in trial, minimal need for jail visits between defendant and counsel, and defendant's failure to seek new counsel prior to his trial.

On December 9, 2020, Judge Arlan L. Harrell provided his ruling on the motion after reviewing the transcripts of the trial and reviewing all defendant's mental health reports. In denying the motion, Judge Harrell explained that Judge Hamlin went into great detail while rendering his verdict even though no explanation was required. The evidence of defendant's alleged mental health difficulties were found to be lacking, and Judge Harrell reiterated Judge Hamlin's conclusion that defendant's mental health claims were merely "putting on a show." Judge Harrell concluded his ruling, as follows:

> "[N]o evidence of any justification or provocation. [Defendant], through his statement to law enforcement, tried to indicate that it was something that the victim said about Rhonda, but again, applying the law just as Judge Hamlin did, I find no base to suggest that a reasonable—a rational person would have responded to any statements concerning someone that that individual may have felt close to to the extent that that individual would have acted out the way [defendant] did; stabbing someone about 30 times and basically almost severing that individual's head at the neck. As was pointed out by Judge Hamlin, you must look at the circumstances of the offense. The defendant drew the victim out of his trailer. . . . [¶] . . . [¶] . . . I would find it quite incredible that [defendant] would start . . . stabbing [Millard] in the chest and neck and then turn him over and stab him in the back of the neck and back of the head. It appears to the Court that this gentlemen did not have a chance; that this was a deliberate, premeditated, act of murder. The—there's no other way of getting around that based upon the evidence that was presented."

In regard to defendant's claim of ineffective assistance of counsel, Judge Harrell found that counsel's actions were sufficient, and he was unsure what else defendant's counsel could have done. The motion for new trial was denied.

## B. *Legal Principles and Standard of Review*

Under section 1181, the trial court may grant a new trial, among other instances, "[w]hen the court has misdirected the jury in a matter of law, or has erred in the decision of any question of law arising during the course of the trial, and when the district attorney or other counsel prosecuting the case has been guilty of prejudicial misconduct during the trial thereof before a jury." (§ 1181, subd. 5.) Section 1181 also confers on the trial court the discretion to grant a new trial "[w]hen the verdict or finding is contrary to law or evidence." (§ 1181, subd. 6.) A new trial may also be granted on nonstatutory grounds where failure to do so would result in a miscarriage of justice or denial of a fair trial. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582; *People v. Whittington* (1977) 74 Cal.App.3d 806, 821, fn. 7.)

Ineffective assistance by trial counsel is a recognized nonstatutory basis for seeking a new trial. (*People v. Fosselman*, *supra*, 33 Cal.3d at p. 582.) On appeal from the denial of a new trial motion based on a claim of ineffective assistance, we review the trial court's factual findings for substantial evidence and review de novo the ultimate issue of whether defendant's constitutional rights were violated. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

The trial court has broad discretion in ruling on a new trial motion and its ruling is reviewed for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.) The court abuses its discretion when it misconceives its duty, applies an incorrect legal standard, or fails to independently consider the weight of the evidence. (*People v. Robarge* (1953) 41 Cal.2d 628, 634.) " ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed

25.

unless a manifest and unmistakable abuse of discretion clearly appears." ' " (*People v. Davis* (1995) 10 Cal.4th 463, 524.)

Finally, "[a] motion for new trial may be granted only upon a ground raised in the motion. [Citations.]" (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508.) Where, as here, the trial court has made a "comprehensive statement denying the motion, we presume the court considered and rejected each ground raised in defendant's motion." (*People v. Lightsey* (2012) 54 Cal.4th 668, 730.) We will not assume, absent an affirmative contrary showing, that the court failed to consider a point simply because it did not mention it.

### C. Analysis

First, we reject defendant's contention that Judge Harrell misstated the *Beltran* test after finding there was no evidence of provocation. Judge Harrell did come to the same conclusion as Judge Hamlin that provocation was not established by the evidence presented at trial. In denying the motion for new trial, Judge Harrell did reiterate Judge Hamlin's statement that no rational person would have reacted to defendant's purported provocation in the manner that defendant did. However, as we previously concluded, such a statement does not "unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law." (*Jerry R.*, *supra*, 29 Cal.App.4th at p. 1440.) Judge Harrell clearly concluded that there was no evidence of provocation after a thorough review of the evidence presented at trial, and thus, the denial of the motion was not based upon an error of law.

Next, defendant insists that the motion for new trial should have been granted based upon his earlier arguments, previously addressed in section I., *ante*, that "there was insufficient evidence of first-degree premeditated murder." This argument is also without merit given our conclusion that the trial court's finding of first degree murder was supported by substantial evidence. Judge Harrell provided a detailed description of the evidence relied upon to support the conviction, and he came to a similar conclusion as

26.

Judge Hamlin that defendant was guilty of first degree murder because he "willfully, deliberately, in a premeditated fashion, [took] the life of [Millard]."

Finally, defendant contends the trial court abused its discretion in denying his motion for new trial because his counsel was constitutionally ineffective for failing to present evidence of delusions, visit defendant in jail, and discuss potential defense witnesses. The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.) The defendant must prove prejudice as a " 'demonstrable reality.' " (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Mere speculation as to the effect of counsel's errors or omissions is not enough. (*Ibid*.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Here, the lack of jail visits does not establish that there was insufficient communication between defendant and his trial counsel over the several years the case was pending. Defendant's implication that a counsel's lack of formal visits to the jail equates to deficient contact relies on pure speculation, which is insufficient to establish ineffective assistance. It is not claimed that his counsel refused to speak with him at the courthouse or by phone such that there was no communication between defendant and his counsel. Furthermore, there is a legitimate tactical reason that his trial counsel would have chosen not to introduce testimony about any of defendant's alleged delusions near the time of the murder because Kodžić had already rendered an opinion that defendant was fabricating hallucinations in the years following the offense. Because we cannot conclude counsel could have had no reasonable tactical purpose, we cannot conclude counsel was ineffective. (See *People v. Hart* (1999) 20 Cal.4th 546, 631–632.)

Although defendant claims he was unable to provide information about his sister and an employer to his trial counsel, his declaration failed to set forth what additional evidence he was unable to present. Thus, the record is bereft of any specifics regarding what testimony might have been introduced; "without engaging in speculation, we cannot infer anything about its existence, availability, or probative force, or the probable consequences of its use at trial." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1116.) In sum, we conclude the trial court did not abuse its discretion in denying defendant's motion for new trial.

## IV. Ineffective Assistance of Counsel

Finally, we address defendant's related claim that both his trial counsel and newly appointed counsel rendered ineffective assistance of counsel by failing to object when each judicial officer purportedly made the same error of law regarding the heat of passion defense. As discussed above, each of the judicial officers concluded there was no credible evidence that defendant was provoked by Millard, which evidences a correct understanding of the law when considering the courts' rulings as a whole. Accordingly,

28.

neither of his counsels' performance was deficient for failing to object to the judges' comments regarding the heat of passion defense. Thus, we reject defendant's claim of ineffective assistance of counsel.

## V.     No Cumulative Error

Defendant argues his murder conviction should be reversed based on the cumulative effect of the errors he asserts in his first four arguments on appeal. "Under the 'cumulative error' doctrine, we reverse the judgment if there is a 'reasonable possibility' that the jury would have reached a result more favorable to defendant absent a combination of errors. [Citations.] 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' [Citation.]" (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217.)

Here, there is no series of errors to cumulate. Accordingly, defendant cannot demonstrate the cumulative effect of the alleged errors resulted in prejudice. (See *In re Reno* (2012) 55 Cal.4th 428, 483 ["As noted, claims previously rejected on their substantive merits—i.e., this court found no legal error—cannot logically be used to support a cumulative error claim because we have already found there was no error to cumulate."].)

## DISPOSITION

The judgment is affirmed.

DETJEN, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

SNAUFFER, J.

29.